All right, our final case for this morning is Rozumalski v. W.F. Baird. Ms. Botry. Thank you, Your Honor. May it please the Court, I am Nicole Markleinbacher. I represent the plaintiff appellant Laura Rozumalski in this matter. Ms. Rozumalski is in court with me today. In this Title 7 case, the first issue before the Court is the amount of evidence that a plaintiff must present on summary judgment when construed in the plaintiff's favor, a fact finder could reasonably infer causation between the plaintiff's statutorily protected activity and the defendant's adverse actions against the plaintiff. Of course, on summary judgment, Ms. Rozumalski is not tasked to present undisputed facts, but I would submit to you that the following facts in this case are undisputed. Rozumalski was sexually harassed on the job in July of 2012. She reported it. On December 10th, 2013, her direct supervisor, Alex Brunton, abruptly started treating her negatively. That negative and adverse treatment continued unabated until she was terminated in June 2014. So can I interject here? There is this breakfast between Brunton and Rydell on December 10, 2013, because I gather, I mean, you're not complaining about the firm's initial response to the complaint of sexual harassment. They fire the guy, but he doesn't really leave. He kind of lurks around and sees people and so on, but there's an admission that Brunton doesn't learn about the reason why Rydell left until much later, and so what I've been trying to think is, are you arguing that actually Rydell has just poisoned Brunton about her? I would call it colloquially trash talking. You know, just say she's not really very good, and I had problems with her, you know, whatever he says in the hopes that Brunton will thwart her career. It's this kind of indirect revenge, and I want to know if that's the theory. How can we reach that theory if you didn't present either a cat's paw argument where Brunton is the unwitting conveyor of these views to management at the company, or if you're not really complaining that the company has anything to do with what Rydell said? Okay. Yes, so the admission that Judge Wood references has to do with, I believe it's Record Document 19, which is the district court's standing order regarding, it's a preliminary pretrial order, but it also governs how parties must respond to and present motions for summary judgment, and that order is very specific with respect to what we were allowed to present if we were going to dispute a fact in response to a proposed finding of fact. The judge and the court, the district court, provides that you may only present documentary evidence to rebut a fact. It says that if you want to make arguments based on the fact, the response to the proposed finding of fact is not the place to do it. So in trying to keep with the court's order on only presenting documentary evidence, we admittedly have none. We don't have an admission by Rydell or Brunton that, yes, we were retaliating against Rosa Malski and that we were trashing her, and Rydell told me about the sexual harassment complaint. Is that even necessary, though? I mean, it seems to me he could have poisoned her reputation with Brunton without ever mentioning that Brunton had made, sorry, that Rosa Malski had made the sexual harassment complaint. Agreed, and that's our alternative arguments. I submit to you that given the timing of this abrupt and negative change by Brunton towards Rosa Malski, which I think it's important to point out that, at least from my reading of Baird's briefs on this point, I don't think Baird is disputing that before this breakfast meeting, Brunton and Rosa Malski had a very close, collaborative, positive professional relationship, and that just switched. So under your argument, what is the statutorily protected activity that you're arguing she was retaliated against for? Beginning December 10, 2013, it goes back to that July 2012 report of sexual harassment, and if that December 10, 2013 breakfast meeting had never occurred, we wouldn't be here. I would submit that to you. It sort of revived it. It brought it back to the forefront. But how is Baird supposed to know about that? I mean, we always need to find some reason that supports employer liability. That's what Ellerth and Janssen and all sorts of cases have been about that. And I can certainly see, I guess what you're saying is, although Baird was okay at first by accepting indirectly and maybe unknowingly Riedel's account of her, it actually in the long run didn't respond appropriately to the complaint, or as the district judge thought, maybe you're complaining about their response after she writes the letters that they solicited from her later on in the spring, that they're saying, you know, you have a bad attitude, why do you have a bad attitude, because of the tone of the letters, but they ask her themselves. The letters, at least I can see, is a form of protected expression. We submit, Your Honor, that it's both. That it relates back to the July 2012 complaint, and that also she then engaged in further protected activity beginning in January 2014. And how Baird knows is through Lars Barber. Lars Barber was a principal, key employee reporting directly to the global CEO. He was Riedel's direct supervisor. He was the person to whom Rosamulski made the complaint of harassment. And he never follows up when she complains, right, in January. And I don't believe Baird argues that Rosamulski's complaints to Barber are not complaints to Baird. I think that's accepted here. But in answer to your previous question, those are our alternative arguments. We think there is a very strong set of evidence here from which a jury could reasonably infer that those two men did discuss that complaint, that July 2012 complaint of harassment at that breakfast meeting. Alternatively, if a jury does not believe that there is sufficient evidence that they actually discussed that meeting, we believe there is sufficient evidence, however, that the cat's paw for Riedel. But just your judge says you waived that argument, that you did not in any way spell out the so-called cat's paw theory. Right. And as we stated in our brief, Your Honor, I believe that it wasn't waived. I believe that all of this evidence and these arguments were made in the briefs. It is true we did not spell out the cat's paw and call it as such, but certainly the arguments were made below. Substance. Correct. I'm getting a little into my rebuttal. What's the evidence of the January 2014 activity that you claim is statutorily protected? What was the activity and what's the evidence of it? I know there's some evidence that she made statements in February of 2014, but I'm not sure what January 2014 was. There's two types of evidence of that January 2014 protected activity. The first is Rosamelsky after December 10th, 2013 is just racking her brain. She cannot justify or understand this abrupt change. It's in January of 2014 that she learns of the breakfast meeting and says now everything makes sense. At that point she went to Lars Barber and it's undisputed. That's in her deposition or something? Correct. Okay, fine. So that's where the evidence comes from. Correct. So she went to Lars Barber and said, I believe that Alex Brunton is treating me like Riedel. We submit that that alone, Barber knew exactly what she was talking about. He had perfect information at that point. He investigated, he knew what Riedel did to her, but we submit further that there's in her declaration, she says after the February 18th, 2014 letter that I received, I again told Lars Barber that I might be the recipient of retaliation. And we think a jury could reasonably infer that that's the second time she expressly told Lars Barber that she believed that she was the recipient of retaliation. And if I could reserve my remaining time, thank you. That's fine. Mr. DiTullio? Thank you, Your Honor. And good morning, Your Honors. May it please the court, my name is Stephen DiTullio. I'm one of the attorneys representing the Appellee W.F. Baird and Associates in this matter. The breakfast meeting is key in the case. There's no question about that. But here's the two most important things to know about the breakfast meeting. Number one, the undisputed evidence is that Ms. Rosamulski was not discussed during that meeting. The two people who were present there, one said it didn't happen, the other couldn't even recall the meeting. But the second- But don't we have, you know, we have circumstantial evidence. I agree with you that the record doesn't include somebody saying, yes, and we spent five minutes talking about this. Okay, fine. So we have an absence of evidence rather than evidence yes or evidence no. But what we do have is circumstantial evidence that this sea change in certainly Mr. Brunton's interactions with her takes place immediately after that. And we know what her history with Mr. Bredel is. And again, I'm trying to like reconcile my own mind. I think it would be extremely easy for something negative to have been said without saying, and by the way, there was a sexual harassment complaint a year and a half ago. Totally understand the question and the point. Let's look at the evidence, though, as well. And I think that will answer your question, okay? Because I challenge that this notion that there was a dramatic, drastic, sudden, and abrupt change after that breakfast meeting is wrong, okay? Why do I say that? There's several reasons I say that. First of all, an abrupt, sudden, drastic change in the employment setting would be things like a termination, a demotion, a cut in pay, a transfer. But why isn't it something like you used to be involved in all the planning meetings and now you aren't, or people aren't giving you the information they would have, or somebody who more or less told you you were going to get a great performance review gives you all mediocre marks. I mean, why isn't that? We're not talking about firings. We're talking about the change in the environment. I totally agree. And change in the environment is important, but also look at that evaluation, okay? I agree with you. 31 factors were evaluated. 24 of them were evaluated as fair, okay? And this is really important. But fair isn't the greatest category on the form. I agree, but look at what they wrote to Ms. Rozumalski one week later in the letter that they sent her on December 19th. It specifically said, as we discussed during your performance review on December 10, 2013, a skills rating of fair reflects an assessment that an employee is performing at their expected level of responsibility and professional expertise. If he really wanted to come back and have some sudden or dramatic attack on her, there would have probably been a lot more rather than in the fair category. It could have been in the needs improvement category. Remind me where in the grant. It's what? Excellent, good, fair, poor or something? It's needs, I think. I have it right here. It is needs work, and then there's a box in between, and then fair, and then a box in between, and then strong. So she was assessed as fair. And by the way, keep in mind that she was assessed fair on a position that she had just been recently promoted to. And a fair for somebody that is new to a position, they were not telling her that she was doing a terrible job. They were telling her she was doing a fair job. There were plenty of positive comments in that evaluation. There were also some things that she needed to work on. It was constructive criticism. So when you look at it from that standpoint, how drastic of a change occurred. Also, keep in mind that within a week of that breakfast meeting, she received a pay raise and a bonus. That is not dramatic, drastic, or sudden. Quite to the contrary. Also, the letter that I referenced. But the bonus was quite a bit smaller than her prior bonuses, wasn't it? It was, but bonuses are not just based on performance. They're also based on company performance in a given year and other factors of that nature. It was about half. I mean, it was considerably more. It was. It was. That's true. The letter that I referenced from December 19th also, and I think this is equally important in regard to this notion that there was some abrupt, sudden change. It went on to say, We appreciate your efforts during 2013, and we see you as a capable future contributor to Growth at Baird. We trust that you will work with us to improve upon these issues, and we look forward to supporting your continued career development at Baird. I submit that. So why didn't they follow up when she goes to Lars and she says, you know, here's this problem. Why not call in Brunton and develop some facts about that breakfast? They just totally dropped the ball. Well, at the point that, and the record shows that, in regard to the discussions between Mr. Barber and Ms. Rozumalski, there were discussions. But what was discussed was that she felt that she had been treated unfairly because of Mr. Rydell's friendship with Dr. Brunton. But again, why isn't that something that the company would look into, develop the facts at the optimal time to develop them, right, contemporaneously, roughly, with when things happen? And if it turns out, I mean, at that point, she would know. The company would know. Everybody would know what prompted this tangible, you know, this palpable change in Brunton's interactions with her. She has lots of other examples in her brief about how she's not being told about things. She's not getting data in an appropriate time frame. You know, why not do that? I mean, because at some point, somebody can feel so alienated that you wind up in this vicious downward cycle, which seems to be what happened to her. I wouldn't necessarily say it was a vicious downward cycle. There were issues, and there was a period of time, again, displacing this sudden or abrupt change. You know, there was a six-month period after that evaluation in which there was discussions about some other performance issues that continued. And then ultimately, when they placed her on that employee improvement plan, and keep in mind that when that occurred in early May, an employee improvement plan is not necessarily a negative. But no one, how many other times, one other time in the company this had ever happened? The employee improvement plan? Yeah. Once subsequently, Your Honor. This was the first time they had done it. It was the first time. So it was the first time they had done it. It was. Well, honestly, I mean, you know, she would be within her rights to find this an extraordinary act. It was extraordinary. It hadn't happened. It's extraordinary. It was out of the ordinary. I would respectfully disagree with that. And the reason I say that is because Barrett is not a large company. I mean, they have less than 100 employees, okay? And if there had never been a situation that required somebody to go on an employee improvement plan, or if it was just an HR device that they weren't as familiar with, and I would also submit that there were other, I can't say that because it's not in the record, so I'll withdraw that. But they certainly had had other performance evaluations and issues with people that they talked to. But with Ms. Rozumolski, the difference was she did not address the issues, the four issues that were raised during that evaluation. I'm concerned with the timing here. You don't seem to be disputing that Bruton treated her differently after that breakfast meeting. I understand you're arguing they don't amount to adverse actions. Yes. But you don't seem to be disputing that the way he treated her or their relationship had changed. And it's right after that breakfast meeting. Well, keep in mind that there is in the record evidence that before that breakfast meeting there were performance issues identified to her. So it's not like she had absolutely no issues of that type, and then after the breakfast meeting they occurred. So that's in the record, that there were both before and after the breakfast meeting issues that came up. But couldn't a trier of fact rationally think that maybe it's a few little nits before, but this torrent of criticism afterwards? Perhaps, but also keep in mind that by the time the employee improvement plan and the termination came about, Dr. Brunton was no longer her supervisor. That had changed, and he was not involved in the implementation of the EIP or the monitoring of it. Yes, he might occasionally be involved only to the point that he was still assigning some work to her, but he was not in control of the EIP, and he had no involvement in the termination decision at all. The termination decision was made by one individual on a series of facts that are undisputed. During this employee improvement plan, Ms. Rosamulski, without dispute, left the premises in the middle of the afternoon, and in prior instances when she had doctor's appointments and other appointments, the record is clear that she did go to her supervisor and say, I am going to be out of the office during this period of time. But then on the circumstances that directly led to her termination, she didn't. And I would submit that that also is a legitimate, reasonable final straw for an employer to make in making a termination decision. I'm just about out of time unless there are any other questions, and I respectfully request that this Court affirm Judge Peterson's decision. Thank you. Okay, thank you. Ms. Bakker, you can finish up. Thank you very much, Your Honor. I just have four brief points to make, if I may, based on counsel's argument. First, there were no performance issues before December 10, 2013. Mr. Brunton admitted that if there were performance issues that were detrimental to the company or its clients, he would have raised them prior to the year-end evaluation, and yet that's exactly what he did not do. But overall, I just want to point out that counsel's really getting into issues of facts that I believe are for a jury to determine at trial here. I would like to direct the Court's attention furthermore to page 125 of Riedel's deposition. On that page, counsel for Baird specifically tries to get Riedel to admit that he never discussed Rosamulski after his termination, and he specifically refused to make that. He said, there's this breakfast meeting, and I'm not going to sit here and say that I didn't talk about her then. A reasonable inference can be made there. For the reasons mentioned, Your Honors, we request that the Court reverse the grant of summary judgment in this case. Thank you. All right. Thank you very much. Thanks to both counsel. The Court will take the case under advisement, and we will be in recess. Thank you.